DECISION
{¶ 1} Relator, Nancy Marlow ("relator"), filed this original action requesting a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order adjusting the start date of her permanent total disability ("PTD") *Page 2 
compensation and to enter an order reinstating the original start date, coinciding with the June 27, 2002 termination of her temporary total disability ("TTD") compensation.[1]
 {¶ 2} Pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals, this court referred this matter to a magistrate who issued a decision, including findings of fact and conclusions of law. (Attached as Appendix A.) The magistrate recommended that the court deny relator's request for a writ of mandamus.
 {¶ 3} No party filed objections to the magistrate's findings of fact, and we adopt those findings as our own. Nevertheless, we reiterate here those facts necessary to our discussion.
 {¶ 4} Relator sustained four industrial injuries while employed in assembly work at a plant owned and operated by DaimlerChrysler, a self-insured employer under Ohio workers' compensation laws. On January 20, 2004, relator filed an application for PTD compensation.
 {¶ 5} A Staff Hearing Officer ("SHO") issued an order on September 16, 2004, granting relator's application for PTD compensation "from last date of Temporary Total Disability Compensation paid[.]" The SHO particularly relied on the following evidence: (1) Dr. Harvey A. Popovich's report, dated May 20, 2004; (2) Dr. Steven N. Sokoloski's report, dated March 31, 2004; (3) Dr. James D. Brue's report, dated June 16, 2004; (4) Dr. Robert MacGuffie's vocational evaluation report, dated June 30, 2004; and (5) Charles Loomis' employability assessment report, dated June 18, 2004. The SHO found: *Page 3 
 The preponderance of the probative medical evidence in file reveals that the [relator] retains the residual functional capacity of limited sedentary employment with a sit/stand option, limited lifting above her head, limited reaching, and limited bending. Considering this limited functional capacity, combined with an extremely limited formal education background, limited academic capacity, no GED degree, limited use and understanding of the English language, and her age of 63, this Staff Hearing Officer finds that there are no jobs available for [relator].
 The evidence establishes by more than a preponderance that [relator] is permanently and totally disabled from any and all gainful employment as a result of the allowed conditions in claim number 97-385524. * * *
 {¶ 6} By letter dated October 12, 2004, DaimlerChrysler requested reconsideration of the PTD award or, alternatively, for an adjustment of the PTD start date and reallocation of the PTD award. Following a March 8, 2005 hearing, the commission found that it did not have authority, pursuant to R.C. 4123.52, to invoke continuing jurisdiction to reconsider the award of PTD. However, the commission referred DaimlerChrysler's request for adjustment of the PTD start date and reallocation to the Hearing Administrator.
 {¶ 7} Following a July 6, 2005 hearing, an SHO issued an order adjusting relator's PTD start date, based on Dr. Sokoloski's March 31, 2004 report and evidence indicating that relator had been unable to work since January 1999. The July 6, 2005 order states, in part:
 The Staff Hearing Officer finds that the onset date of last payment of temporary total compensation is inaccurate. The permanent and total disability finding is based upon the reports of Dr. Popovich, Dr. [Sokoloski] and Dr. Brue. This is also a Vocational PTD finding in conjunction with the *Page 4 
 medical. As a result, the earliest report indicating permanent and total disability is the report of Dr. [Sokoloski], dated 3/31/04.
 * * * Dr. [Sokoloski] did see [relator] on 12/10/00, but at that time indicated that [relator] was not maximally medically improved, and she could not return to her former position of employment. Dr. [Sokoloski] then did not see [relator] again until 3/31/04. It would be inappropriate to back-date the start date of [PTD] to the termination date of the maximum medical improvement (MMI). First, the MMI was not based upon Dr. [Sokoloski's] report. Second, his first report does not address the issue of permanency, and the second report is not generated until 3/31/04.
Relator requested reconsideration of the July 6, 2005 order, but the commission denied relator's request.
 {¶ 8} On September 13, 2005, relator filed this original action for a writ of mandamus ordering the commission to vacate its July 6, 2005 order and to reinstate the original PTD start date. With respect to relator's request for a writ of mandamus, the magistrate concluded that: (1) the SHO's September 16, 2004 order contained a clear mistake of law in commencing the PTD award as of the last payment of TTD compensation rather than upon the evidence relied upon to support the PTD award; (2) the commission appropriately exercised its continuing jurisdiction when it ordered the SHO to proceed to adjust the PTD start date; and (3) the SHO's July 6, 2005 order was supported by some evidence.
 {¶ 9} Relator filed a timely objection to the magistrate's conclusions of law, arguing that the magistrate erred by finding that the start date of PTD compensation must coincide with the date of a medical report.[2] Although relator acknowledges that *Page 5 
the start date of PTD compensation must be based on some evidence in the record, she contends that the magistrate incorrectly required that the start date coincide with the date of a medical report. Relator argues that the medical evidence, combined with the non-medical, vocational factors, constituted some evidence supporting a PTD start date coinciding with the termination of her TTD compensation. In response, DaimlerChrysler argues that the magistrate correctly determined that the September 16, 2004 order did not cite some evidence to support the June 2002 start date, did not adequately explain the rationale for the start date, and, thus, contained a clear mistake of law.
 {¶ 10} Relator's objection stems primarily from the commission's invocation of its continuing jurisdiction to adjust the PTD start date. A request for adjustment of a PTD start date requires the commission to exercise its continuing jurisdiction pursuant to R.C. 4123.52. State exrel. Poneris v. Indus. Comm., Franklin App. No. 05AP-111,2005-Ohio-6208, at ¶ 13. The commission's continuing jurisdiction is not unlimited; its prerequisites are: (1) new and changed circumstances; (2) fraud; (3) clear mistake of fact; (4) clear mistake of law; or (5) error by an inferior tribunal. State ex rel. Nicholls v. Indus. Comm. (1998),81 Ohio St.3d 454, 458-459. It is clear from the July 6, 2005 order that the SHO found a clear mistake of law in the establishment of the PTD start date based on the termination date of relator's TTD compensation. Relator disagrees and reargues that there was no clear mistake of law in the September 16, 2004 order to warrant the commission's exercise of continuing jurisdiction.
 {¶ 11} In determining PTD, the ultimate consideration is whether the claimant is unfit for sustained remunerative employment. State ex rel.Stephenson v. Indus. Comm. (1987), 31 Ohio St.3d 167, 170. To answer that query, the commission must *Page 6 
review all evidence in the record, including doctors' reports and opinions. Id. "The commission must also review any evidence relative to the claimant's age, education, work record, psychological or psychiatric factors if present, and that of a sociological nature[,]" in addition to "any other factors that might be important to its determination of whether this specific claimant may return to the job market by utilizing her past employment skills, or those skills which may be reasonably developed." Id. In an order granting or denying benefits, the commission must specifically state what evidence it relied upon and must briefly explain the reasoning for its decision. State ex rel. Noll v. Indus.Comm. (1991), 57 Ohio St.3d 203, syllabus. As the Ohio Supreme Court has noted, "a meaningful review can be accomplished only if the commission prepares orders on a case-by-case basis which are fact-specific and which contain reasons explaining its decisions." Id. at 206.
 {¶ 12} Some evidence upon which the commission relied to award PTD must support the PTD start date. See State ex rel. Johns Manville Intl.,Inc. v. Indus. Comm., Franklin App. No. 02AP-957, 2003-Ohio-5808;State ex rel. Dingus v. Quinn Dev. Co. (1994), 70 Ohio St.3d 580;State ex rel. Wheeling-Pittsburgh Steel Corp. v. Indus. Comm., Franklin App. No. 05AP-913, 2006-Ohio-3912, at ¶ 10 (where magistrate eliminated medical report as equivocal, report could not serve as the basis for a PTD start date). Here, none of the medical reports that the commission relied upon to grant relator's PTD application coincided with the termination date of relator's TTD compensation. Nor do any of the relied upon reports address relator's medical condition as of the time that her TTD compensation terminated. *Page 7 
 {¶ 13} In the September 16, 2004 order granting relator's application for PTD, the SHO reviewed the doctors' reports and found that the preponderance of the probative medical evidence revealed that relator retained the residual functional capacity of sedentary employment with various restrictions. This court has stated that, "where there is medical inability resulting from allowed causes to return to the former position of employment, but there is the medical ability to perform other employment (generally `lighter' or less physical work) * * * the non-medical Stephenson factors must be reviewed to answer the query of whether the claimant is unfit to work at any sustained remunerative employment." State ex rel. Speelman v. Indus. Comm. (1992),73 Ohio App.3d 757, 762. Thus, as required by Speelman, the commission reviewed non-medical, vocational factors, including relator's age, limited education, difficulty with English, and work history, along with the medical evidence in determining that relator was not fit for any sustained, remunerative employment and granting her PTD application.
 {¶ 14} In light of the SHO's consideration of non-medical, vocational factors in determining relator's entitlement to PTD compensation, relator argues that the SHO also properly relied on such factors in establishing the start date for her PTD award. To the contrary, DaimlerChrysler argues that, because none of the medical reports that the commission relied upon constituted some evidence that relator was permanently and totally disabled as of the date that her TTD terminated, the commission failed to specify what evidence it relied on and to explain its reasoning with respect to the start date, in violation ofNoll. We agree. *Page 8 
 {¶ 15} None of the medical reports the commission relied upon in granting relator's PTD application provided any evidence of relator's medical condition in June 2002, when her TTD compensation terminated. In the absence of any medical evidence, non-medical, vocational factors are insufficient to warrant entitlement to PTD compensation. Rather, such factors become relevant only upon a finding, based upon the medical evidence, that relator was unable to return to her former position, but may have been able to engage in other sustained, remunerative employment. See State ex rel. Gemind v. Indus. Comm. (1998),82 Ohio St.3d 457, 460 ("[t]he commission's consideration of theStephenson factors is essential to the determination of permanent total disability, where the medical evidence indicates that the claimant iscapable of some work and the nonmedical disability factors indicate that the claimant cannot realistically engage in sustained remunerative employment"). (Emphasis added.) The evidence the commission relied upon provides no basis for such a finding relating to the time relator's TTD compensation terminated. Additionally, the commission offered no explanation of its reasoning for back-dating relator's PTD award to the date relator's TTD compensation terminated. Other than stating that relator's "limited educational background and academic capacity with no GED degree made her unacceptable for most formal vocational programs even at age 58[,]" when she last worked, the commission's order contains no analysis of either relator's medical condition or of non-medical factors as they existed in June 2002. (Emphasis added.)
 {¶ 16} Both the July 6, 2005 SHO order and the magistrate relied onState ex rel. Baker v. Indus. Comm., 97 Ohio St.3d 267, 2002-Ohio-6341, in concluding that the September 16, 2004 order contained a clear mistake of law. In Baker, the commission *Page 9 
granted the claimant's application for PTD with a start date of July 28, 1999, the date of the medical report the claimant submitted in support of his application. In the July 28, 1999 medical report, the examining doctor stated his opinion that the claimant was permanently and totally disabled and had been unfit for gainful remunerative employment since September 26, 1994. The claimant sought a writ of mandamus, seeking an earlier PTD start date of September 26, 1994. The Ohio Supreme Court rejected the claimant's position. As relevant here, the court found that the commission did not abuse its discretion by rejecting the doctor's statement that the claimant had been permanently and totally disabled since September 26, 1994, because the doctor had not seen or treated the claimant in 1994, and because the doctor's selection of the PTD start date "coincides more with the termination date of temporary total disability compensation than it does with anything of a medical nature." Id. at ¶ 6.
 {¶ 17} Here, like in Baker, none of the relied upon medical reports indicate that the reporting doctors examined or treated relator in 1992. Moreover, as Baker makes clear, selection of a PTD start date based on the termination of temporary total disability, absent supporting medical evidence, is inappropriate. While we agree with relator thatBaker does not relieve the commission of its ultimate authority and duty to determine disability, neither does it alter established requirements that the commission base its determination on the evidence, specifically state what evidence it has relied upon, and briefly explain the reasoning for its decision. The September 16, 2004 order fails to comply with those requirements. Accordingly, we agree with the magistrate's conclusion that the September 16, 2004 order contained a clear mistake of law, which properly served as a prerequisite to the commission's exercise of continuing jurisdiction. *Page 10 
 {¶ 18} Lastly, we agree with the magistrate that some evidence, namely Dr. Sokoloski's report, supports the July 6, 2005 SHO order establishing a PTD start date of March 31, 2004. See Baker at ¶ 5 (doctor's report constituted some evidence supporting a PTD start date coinciding with the date of the report); State ex rel. S. Rosenthal Co., Inc. v. Indus.Comm., Franklin App. No. 03AP-113, 2004-Ohio-549, at ¶ 6 (medical report was some evidence supporting the commission's decision to start PTD on the date of the report). Moreover, we reject relator's argument that the magistrate arbitrarily found that relator was not permanently and totally disabled until March 31, 2004. The magistrate made no such finding, stating, at ¶ 85:
 * * * Obviously, when the commission commences an award of compensation based upon the evidence upon which it relies, in theory, the claimant could have been disabled prior to the commencement of the award. However, the commission must base its decision on the evidence before it and that is what the commission has done in this case.
We agree.
 {¶ 19} After examining the magistrate's decision and conducting an independent review of the evidence, pursuant to Civ.R. 53, we overrule relator's objection and adopt the magistrate's decision, including the findings of fact and conclusions of law contained therein, as our own. In accordance with the magistrate's decision, we deny relator's request for a writ of mandamus.
Objection overruled, writ of mandamus denied.
 BROWN and McGRATH, JJ., concur. *Page 11 APPENDIX A MAGISTRATE'S DECISION {¶ 20} In this original action, Nancy Marlow, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order readjusting the start date of an award of permanent total disability ("PTD") compensation to coincide with the March 31, 2004 report of Steven N. Sokoloski, M.D., *Page 12 
and to enter an order that reinstates the start date that coincides with the June 27, 2002 termination of temporary total disability ("TTD") compensation.
 {¶ 21} In its cross-claim, respondent DaimlerChrysler Corporation ("Daimler-Chrysler") requests a writ of mandamus ordering the commission to vacate its PTD award and its order denying DaimlerChrysler's motion for reconsideration and returning this cause to the commission for further proceedings on relator's PTD application.
Findings of Fact: {¶ 22} 1. Relator has sustained four industrial injuries while employed in assembly work at a plant owned and operated by DaimlerChrysler, a self-insured employer under Ohio's workers' compensation laws.
 {¶ 23} 2. According to the September 16, 2004 order of a staff hearing officer ("SHO") awarding relator PTD compensation, the four industrial claims are allowed for:
 CLAIM NUMBER 97-385524: LUMBOSACRAL MYOFAS-CIAL STRAIN; SPRAIN/STRAIN OF SACROILIAC JOINT; AGGRAVATION OF PRE-EXISTING DEGENERATIVE DISC DISEASE AT L5-S1.
 CLAIM NUMBER 690634-22: HEMATOMA, LEFT LEG; FRACTURE OF LEFT PROXIMAL TIBIA; POSTOPERATIVE TORN MEDIAL MENISCUS; CHRONIC BURSITIS OF LEFT KNEE.
 CLAIM NUMBER OD41427-22: BILATERAL EXTENSOR DIGITORIUM TENDONITIS; CERVICAL STRAIN; THORACIC OUTLET SYNDROME.
 CLAIM NUMBER L251323-22: LEFT HIP STRAIN AND LUMBAR STRAIN; CONTUSION, LEFT HIP; CONTUSION, LEFT KNEE; CONTUSION, LEFT CALF AND ANKLE.
 {¶ 24} 3. On April 24, 2002, at DaimlerChrysler's request, relator was examined by S.S. Purewal, M.D. According to his report, Dr. Purewal examined relator "with *Page 13 
reference to her job-related injury claim dated 04/02/97." Parenthetically, the magistrate notes that claim number 97-385524 is assigned to the industrial injury that occurred on April 2, 1997. In his April 24, 2002 report, Dr. Purewal states:
 PAST HISTORY: Review of the medical records and past history given by the patient reveals that she has had surgeries for both shoulders, bilateral carpal tunnel syndromes, left thoracic outlet syndrome, and left knee meniscus injury. All those surgeries were done under Workers' Compensation claims.
 CURRENT COMPLAINTS: Currently she complains of chronic pain in her lower back with intermittent radiation to the right hip and leg. She takes Celebrex and Anexsia for her pain. She is also taking oral medications for her diabetes.
* * * *
 DISCUSSION AND OPINION: This claim is dated 04/02/97 and allowed for lumbar sprain/strain. Based on my evaluation of this patient, it is my opinion that the allowed condition which occurred 5 years ago has obviously reached maximum medical improvement. The ongoing cause of this patient's lower back pain is degenerative disc disease with mild bulging at L5-S1. This is a preexisting and unrelated medical condition.
* * * *
 Taking into account the allowed condition of lumbar sprain/strain only, this patient would have been able to return to her employment without specific restrictions. On the other hand, when all her other medical conditions are considered collectively, she is not able to return to her pervious employment at the Jeep Plant. As noted above, she has had multiple surgical procedures on her shoulders, hands, left first rib, and left knee. Her condition and inability to return to her previous job is permanent.
 There is no evidence of any permanent disability that resulted from the allowed condition of lumbar sprain/strain that occurred on 04/02/97. *Page 14 
 {¶ 25} 4. On May 30, 2002, DaimlerChrysler moved to terminate TTD compensation based upon Dr. Purewal's April 24, 2002 report.
 {¶ 26} 5. Following a June 27, 2002 hearing, a district hearing officer ("DHO") issued an order terminating TTD compensation that had been paid in claim number 97-385524. The DHO's decision was based in part upon Dr. Purewal's April 24, 2002 report. The DHO's order was not administratively appealed.
 {¶ 27} 6. On January 3, 2003, relator moved for an additional claim allowance in claim number 97-385524.
 {¶ 28} 7. Following a February 19, 2003 hearing, a DHO issued an order granting an additional claim allowance for "aggravation of pre-existing degenerative disc disease at L5-S1." The grant of the additional claim allowance was administratively affirmed following an April 20, 2003 hearing before an SHO.
 {¶ 29} 8. On January 20, 2004, relator filed an application for PTD compensation. The application form asks the applicant to list all claim numbers that the applicant wants the commission to consider in the processing of the application. In response, relator listed claim numbers 690634-22, OD41427-22, L251323-22 and 97-385524.
 {¶ 30} 9. The PTD application form also asks the applicant to identify the report that the applicant relies upon in filing the application. In response, relator identified the September 8, 2003 report of James E. Lundeen, Sr., M.D.
 {¶ 31} 10. The PTD application form also asks the applicant to "[l]ist all operations and surgical procedures you have undergone." Among the surgical *Page 15 
procedures relator listed was an October 1, 1996 "left shoulder repair" and a February 1, 1996 "right shoulder repair."
 {¶ 32} 11. Earlier, relator was examined on September 8, 2003 by Dr. Lundeen. On page one of his nine-page report dated November 2, 2003, Dr. Lundeen lists all four claim numbers and his understanding of the claim allowances with respect to each claim number. This listing of claim allowances states in part:
 Claim Number: OD41427-22.
 Allowed Condition(s): bilateral epicondylitis; right rotator cuff tendinitis; bilateral extensor digitorum tendinitis; cervical strain; bilateral shoulder tendinitis; bilateral thoracic outlet syndrome.
 {¶ 33} Dr. Lundeen examined relator's left knee, cervical spine, left shoulder, left elbow, right shoulder, right elbow, left hip/thigh, left ankle/foot and lumbar, lumbosacral, sacral spine.
 {¶ 34} Dr. Lundeen also examined the lower extremity for motor function impairment. Dr. Lundeen concluded:
 On the basis of the allowed condition(s) of these industrial claims, the medical histories and all medical information available at this time to this examiner, the findings on physical examination being both subjective and objective, it is my opinion that the claimant, Nancy Marlow, is permanently and totally disabled as a direct result of the injuries she sustained in these industrial claims. There is no expectation of recovery from her injuries. The natures and extents of injuries sustained in these industrial accidents are more than sufficient to permanently remove her from the industrial workplace setting. Moreover, I opine that she has no potential for retraining.
(Emphasis sic.) *Page 16 
 {¶ 35} 12. On March 31, 2004, at DaimlerChrysler's request, relator was examined by Steven N. Sokoloski, M.D., who reported:
 * * * Patient reports that she currently has complaints of low back and leg pain. She says the pain is mainly in the right lower back and that it will radiate to the right posterior calf and thigh. * * * The patient made no mention of any complaints as far as shoulder, neck, or elbow pain. When asked, she did report that she has occasional ache in them, which is effected by the weather.
 PHYSICAL EXAMINATION: On examination of the right shoulder the patient had apparent distal clavicle resection with a well healed surgical incision. There is no redness or signs of infection. She has minimal tenderness at the acromioclavicular joint. There is no pain on adduction of the arm across the chest. Patient has flexion to 170-degrees. She has full abduction and full internal-external rotation. She has excellent cuff strength without pain. There are no signs of instability at the shoulder.
 Examination of the left shoulder also shows minimal tenderness at the acromioclavicular joint. Range of motion shows flexion to 170-degrees and the rest of range of motion is normal. Again excellent strength in the cuff. Again no signs of instability. Examination of both elbows shows no bruising and no swelling. She has full range of motion of the elbows. No tenderness over any of the bony prominences. She has a normal motor and sensory exam.
 The patient reports in her back that the leg pain and back is about 50/50. Examination of the lumbar spine shows no paraspinal muscle spams [sic] or tenderness. Waddell signs are negative. She is able to forward flex to 90-degrees with her hands being about ten inches from the floor; this is without pain. She is able to extend to 20-degrees with some increased pain in her lower back. Side bending motion is excellent with slightly increased pain on side bending to the right. Motor exam of the lower extremities shows no gross motor or sensory deficits. She has a negative straight leg raise bilaterally. There are no signs of clinical instability in the lumbar spine. *Page 17 
 I did have a large amount of medical records to review. Of interest regarding the injury, the patient did have surgery on October 1, 1996 of the left shoulder; preoperative, as well as postoperative diagnosis including left shoulder chronic impingement with left rotator cuff tear. The patient did have what was noted as a small rotator cuff tear repaired. Patient underwent surgery on the right shoulder on February 1, 1996 and preoperative diagnosis again on this side was chronic impingement of the right shoulder and postoperative diagnosis also chronic impingement with rotator cuff tear. Again a small full thickness cuff tear was identified and repaired.
 Regarding the patient's various claims, on claim number OD41427-22 I do feel the patient has reached maximum medical improvement and I feel that no further treatment is medically necessary. On current exam the patient has no permanent disability from these conditions. It should be noted, however, that the patient has not worked for quite some time and from review of the chart she did have problems with her shoulder with repetitive type activity especially overhead.
 Claim L251323-22 that involved diagnosis of left hip strain, lumbar strain, contusion to left hip and left knee I again see no current evidence of ongoing disability. I feel the patient has reached maximum medical improvement regarding this claim as well.
 The final allowed claim 97-385524, which was allowed for lumbosacral myofascial strain, SI joint sprain/strain, and aggravation of preexisting degenerative disc disease at L5-S1 I do not feel the patient has necessarily reached maximum medical improvement. I feel that it appears that surgical intervention would not be beneficial at this time. The patient, I think, would benefit from an aggressive physical reconditioning program.
 I see no reason why the patient cannot return to work. As far as specific restrictions, I feel it is difficult to place her under at this time because it has been quite some time since the patient has done any physical work. By my exam today, I see no objective evidence for any restrictions; however, because of her subjective complaints I feel the patient may require a job that is mainly sit down but with a sit/stand option and would have limited lifting above her head and reaching. A functional capacity evaluation would be beneficial in further *Page 18 
 determining work restrictions. Considering only the allowed claims and utilizing the fifth addition [sic] of the AMA Guides to evaluation of permanent impairment, I feel the patient has 1% impairment at the right shoulder and 1% impairment at the left shoulder. These each convert in to 1% impairment of the whole person. As far as her elbows are concerned, I feel that her permanent impairment is 0. Currently for her lumbar spine the patient would have a 2% impairment of the whole person. I see no other evidence of any permanent impairment. Therefore, I would rate her at 4% whole body impairment.
 Because of the above findings, I feel that the patient does have residual functional capacity to engage in employment.
 {¶ 36} 13. On May 20, 2004, at the commission's request, relator was examined by Harvey A. Popovich, M.D. On page one of his six-page narrative report, Dr. Popovich lists the four industrial claim numbers and his understanding of the claim allowances for each claim. The listing states in part:
 Claim number: OD41427-22
 Date of injury: 9/21/90
 Claim allowances: Bilateral extensor digitorum tendonitis;
 cervical strain; thoracic outlet syndrome.
 {¶ 37} Dr. Popovich opined that relator has a five percent whole person impairment for the allowed conditions in claim number 97-385524 and a two percent whole person impairment for the allowed conditions in claim number L251323-22. Dr. Popovich combined the two impairment percentages for a seven percent whole person impairment for his examination.
 {¶ 38} 14. Dr. Popovich also completed a physical strength rating form on May 20, 2004. He indicated on the form that relator can perform "sedentary work" based upon all four industrial claims.
 {¶ 39} 15. DaimlerChrysler requested a medical file review from James D. Brue, M.D. On the first page of his 13-page report dated June 18, 2004, Dr. Brue listed the *Page 19 
four industrial claim numbers and his understanding of the claim allowances corresponding to each claim. Dr. Brue's listing states in part:
 Claim #OD42427-22 [sic]-DOI 9/21/90 — bilateral extensor digitorum tendinitis, cervical strain, thoracic outlet syndrome, bilateral shoulder tendinitis, bilateral epicondylitis, and right rotator cuff tendinitis.
 {¶ 40} On page three of his report, Dr. Brue lists the claim allowances for the September 21, 1990 injury:
 Claim #OD 41427-22, DOI 9/21/90, Allowed conditions right extensor digitorum tendinitis, cervical strain, thoracic outlet syndrome, bilateral tendinitis and rotator cuff tendinitis, and bilateral epicondylitis.
(Emphasis omitted.)
 {¶ 41} On page four of his report, Dr. Brue wrote:
 Michael Diment, MD
 Several records were reviewed. The first record is dated 2/1/96. Preoperative diagnosis was "chronic impingement of right shoulder." Postoperative diagnosis was the same, but the additional condition of right rotator cuff tear. Please note, neither of these conditions are allowed conditions in this claim. In the body of the operative report, it stated that she had thickened subacromial bursa and noted a small partial defect in the supraspinatus muscle. He stated the rotator cuff was debrided and then secured. It stated that a small, full thickness tear was identified. It was identified as being 1 cm x 1 cm. A partial acromioectomy was performed and the under surface of the clavicle was debrided.
 Operative Report
 The next record is an operative reported [sic] dated 10/1/96. Preoperative diagnosis was left shoulder chronic impingement. Postoperative diagnosis was the same with the addition of left rotator cuff tear. A small amount of fluid was noted in the subacromial bursa. They again performed a bursectomy and an open partial acromionectomy. A small *Page 20 
 rotator cuff tear was identified, which then was repaired. Several postoperative reports and office notes were noted.
 On pages 12 and 13 of his report, Dr. Brue concludes:
 * * * In full consideration of the four claims as stated above, it is my medical opinion that she is not able to return to her former position of employment at Daimler Chrysler without restrictions. Based upon the findings as far as the lower back is concerned, with the history of sacroilitis and mild degenerative disk disease, it would be my recommendation that she should do jobs that would avoid deep bending on an [sic] repetitive basis. She could frequently to occasionally, do bending of 20 to 45 degrees. She should avoid lifting of more than 20 pounds on an occasional basis. A job where she could change postures from sit to stand periodically during the course of her work day would also be beneficial. This is predominatly [sic] because of the sacroiliac joint disease. Regarding her shoulders, it is clear that many of her symptoms are related to the degenerative disk disease from the cervical spine. However, with the history of the previous shoulder surgeries, she would be limited to no frequent or repetitive overhead or above-shoulder work. Again, the 20 pound lifting restriction would also be appropriate. However, those restrictions would be based upon the history of the rotator cuff tear and repair, and the repair of the chronic impingement syndrome and the cervical disk disease. To my understanding, those are currently not allowed conditions in her claims. As regard to the other two claims, there is no documentation of any significant impairment on clinical examination and no restrictions would be medically justified.
 Considering the allowed conditions in the four previously named claims, it is my medical opinion that she does have the functional capacity to engage in sustained remunerative employment.
 In full consideration of the conditions allowed in the four above claims, and using the AMA Guides, Fifth Edition, it is my medical opinion that she has 5% whole person impairment for Claim #97-385524. She has 0% impairment for the Claim #L251323-22. For Claim #OD41427-22, she has 3% whole person impairment. For Claim #690634-22, she has 1% *Page 21 
 impairment. Using the combined values chart, this would give her an [sic] 9% whole person impairment for all four claims.
(Emphasis sic.)
 {¶ 42} 16. Relator requested a vocational report from psychologist Robert A. MacGuffie, Ph.D. Dr. MacGuffie's report, dated June 30, 2004, is contained in the stipulated record.
 {¶ 43} 17. The commission requested an employability assessment report from Charles Loomis, a vocational expert. The Loomis report, dated June 18, 2004, is contained in the stipulated record.
 {¶ 44} 18. Following a September 16, 2004 hearing, an SHO issued an order awarding PTD compensation. The SHO's order states:
 Permanent and total disability compensation is hereby awarded from last date of Temporary Total Disability Compensation paid, less any Compensation which may have been previously awarded from said date, and to continue without suspension unless future facts or circumstances should warrant the stopping of the award; and that payment be made pursuant to Ohio Revised Code Section 4123.58(A).
 All medical reports and evidence contained in the Industrial Commission file, as well as the evidence and arguments presented at hearing, were reviewed, considered and evaluated. This order is based particularly upon the reports as outlined in the body of this order.
 This Staff Hearing Officer finds that the injured worker was born on November 20, 1940, and is currently 63 years old. The injured worker's parents were migrant workers. As a result, she moved frequently and did not start formal education until she was 11 years old. She stopped attending school at age 17 or 18 in 1958 because she was too old and too big to be in elementary school. She never obtained a GED degree. Information in the file as well as testimony at hearing reveals that the injured worker allegedly was passed through the grades because she was older and taller then the other elementary students. However, she states that she never *Page 22 
 passed her tests. Nevertheless, the injured worker can read, write, and do basic math, but not very well.
 The injured worker performed work as a migrant worker from age 7 or 8 forward working in the farm fields picking fruits and vegetables. At some unidentified point in time, she became a laborer in a greenhouse stocking bags of soil, fertilizer and stones, moving merchandise, and watering plants. She then obtained a job with the instant employer from 1978 through 1999 as an automobile production worker.
 All of the above captioned injuries occurred while employed with the instant employer. On May 17, 1979, the injured worker was inside of a car putting sealer under the dash. Her left leg was out the open door of the vehicle. The line kept moving and the vehicle door hit a steel wall beside the line shutting it on her left knee. This injury resulted in claim number 690634-22 allowed for conditions noted above. The injured worker underwent surgery by Dr. Habusta in 1980. She also underwent a second left knee surgery on October 20, 1989. The injured worker was able to return to work to the former position of employment subsequent to this injury.
 While performing duties as an assembly line worker, the injured worker had to push and pull hard to connect various hoses. She pinched clamps with her thumbs and fingers. She developed pain and stiffness in her upper extremities, shoulders, and cervical area. These conditions were codified in claim number OD41427-22 allowed for conditions noted above. The injured worker's treatment included right shoulder repair on February 1, 1996, and left shoulder repair surgery on October 1, 1996. Due to continued complaints, the injured worker underwent a left rib resertion and scalenectomy surgery by vascular specialist, Dr. Vicente, on February 10, 1998.
 On March 2, 1994, the injured worker slipped and fell on ice. This injury resulted in claim number L251323-22 allowed for conditions noted above. She was briefly off of work, and was able to return to the former position of employment subsequent to this injury.
 As part of her job duties, the injured worker was required to reach over cars to wipe with alcohol rags for cleaning purposes. The injured worker began to experience sharp pain in her low back due to bending and reaching activities. She *Page 23 
 developed low back complaints which was codified in claim number 97-385524. Treatment was conservative in nature, but involved extensive indemnity cost. The injured worker was no longer able to work as of January 4, 1999, at age 58, due to the allowed conditions in claim number 97-385524. As a result, the injured worker retired from work with the instant employer due to her inability to continue to perform her job duties primarily due to the allowed conditions in claim number 97-385524.
 The employer contended at hearing that Permanent and Total Disability Compensation was precluded due to "voluntary abandonment of employment" because the injured worker retired from employment. This contention is not persuasive. Temporary Total Disability Compensation was paid subsequent to the injured worker's retirement from this employer. Further, the injured worker testified at hearing that she took the retirement because she was no longer able to perform her job due to the allowed conditions in claim number 97-385524. She further testified that she desired to continue to work and build her retirement benefits with this employer since she only had 21 years of service before she was forced to stop working. Therefore, based upon this evidence, this injured worker's retirement from this employer is not deemed to be "voluntary abandonment of employment".
 On January 20, 2004, the injured worker filed her IC-2 Application for Permanent and Total Disability Compensation contending that the allowed conditions in the above captioned claims render her permanently unable to engage in any sustained remunerative employment. For the following reasons, the injured worker's contention is persuasive.
 An Independent Medical Evaluation was performed by Dr. Popovich on May 20, 2004, and a detailed report of his findings was submitted to the file. Dr. Popovich reviewed the medical evidence, evaluated the injured worker, and concluded with his opinion that the injured worker is precluded from returning to the former position of employment. From a functional perspective, she would be limited to sedentary work.
 Dr. Sokoloski, orthopedist, performed an Independent Medical Evaluation on behalf of the employer and submitted a report to the file dated March 31, 2004. Dr. Sokoloski concluded with his opinion that the injured worker would not be capable of *Page 24 
 returning to the former position of employment. Dr. Sokoloski opined that the injured worker would be capable of performing ". . . a job that is mainly sit-down but with sit/stand option and would have limited lifting above her head and reaching".
 The employer also requested Dr. Brue to perform a file review of all of the medical information involved in the above captioned claims. Dr. Brue submitted a report to the file dated June 16, 2004. Dr. Brue concluded with his opinion that the injured worker is not able to return to the former position of employment with instant employer without restrictions. Dr. Brue opined that the injured worker could perform "a job where she could change postures from sit to stand periodically during the course of her work day". Dr. Brue also opined that the injured worker should avoid lifting more than 20 pounds on an occasional basis. She also should avoid jobs that require deep bending on a repetitive basis, although she could do work that would require frequent to occasional bending of only 20 to 45 degrees.
 As noted above, the general consensus of Dr. Popovich, Dr. Sokoloski, and Dr. Brue, is that the injured worker would be capable of performing, from a functional perspective, a sedentary type job with further restrictions of sit/stand option with limited lifting above the head, limited reaching and limited bending activities.
 A Vocational Evaluation was conducted on June 23, 2004, by Dr. Robert MacGuffie, and a report of his findings was submitted to file dated June 30, 2004. Dr. MacGuffie submitted the injured worker to a Wide Range Achievement test that measures reading, spelling, and arithmetic skills. The injured worker performed relatively poorly on the test revealing that she reads and spells at the 3rd grade level, and performs arithmetic at the 6th grade level. Dr. MacGuffie concluded that the injured worker does not possess any skills that she may have developed in her previous jobs to transfer to any potential jobs within her limited functional capacity. Dr. MacGuffie further noted that the injured worker is currently 63 years old with limited specific vocational preparation, reading and spelling at only the 3rd grade level and performing arithmetic at the 6th grade level, and does not have any transferable skills to bring to any potential jobs within her limited functional capacity. Further, Dr. MacGuffie noted that the injured worker has limited knowledge of the English language, which is a further barrier for re-employment. Dr. *Page 25 
 Mac-Guffie concluded that the injured worker is permanently and totally disabled from a vocational perspective. An Employability Assessment was performed on behalf of the Industrial Commission by Charles Loomis and a report was submitted to the file dated June 18, 2004, regarding the injured worker's capacity for employment from a vocational perspective. Mr. Loomis noted that the injured worker is closely approaching advanced age. As such, the injured worker's age would appear to be "at least a moderately limiting factor". The injured worker has a limited education which would further reduce the occupational options available to her. Finally, Mr. Loomis noted that the injured worker has engaged primarily in unskilled entry-level work which "does not provide for transferability to other occupations". Mr. Loomis noted that significant issues regarding potential employment are that the injured worker is closely approaching advanced age, has a marginal education, and very limited work skills.
 This Staff Hearing Officer finds that the injured worker has exhibited a strong work ethic her entire life. She begun [sic] working as a migrant worker performing labor in the fields, at age 7, picking fruits and vegetables. Due to the nature of her parent's occupation she moved frequently. As a result, she had limited formal education. She did not even began [sic] formal schooling until she was 11 years old and stopped attending school at age 17 or 18, while she was still in elementary school. She never obtained a GED degree. Further, the records in file reveal that the injured worker has difficulty with the English language. She reads and spells at the 3rd grade level, which would be consistent with her minimal formal schooling. She performed medium to heavy labor unskilled jobs her entire life. She last worked with this employer at age 58. She underwent further medical treatment and collected Temporary Total Disability benefits due to the allowed conditions in claim number 97-385524 until the year 2002, when she was 62 years old. Given this background, this Staff Hearing Officer finds that the injured worker is not a viable candidate for vocational rehabilitation. Further, when she last worked on January 4, 1999, at age 58, she was not a viable candidate for vocational rehabilitation. Her limited educational background and academic capacity with no GED degree made her unacceptable for most formal vocational programs even at age 58. Currently, at age 63, she is beyond the age of viable vocational rehabilitation. *Page 26 
 This Staff Hearing Officer finds that the injured worker did not have, nor does she currently have, the capacity for vocational rehabilitation based upon her extremely limited formal education, limited reading and writing ability, and lack of a GED degree. The injured worker performed the only work that she was capable of performing, which was medium to heavy unskilled labor. As reflected in the above analysis, the injured worker returned to the former position of employment despite numerous surgeries over the years with this employer until she developed a severe low back problem codified in claim number 97-385524. She was never able to return to work because of the low back problems since January 4, 1999.
 The preponderance of the probative medical evidence in file reveals that the injured [worker] retains the residual functional capacity of limited sedentary employment with a sit/stand option, limited lifting above her head, limited reaching, and limited bending. Considering this limited functional capacity, combined with an extremely limited formal education background, limited academic capacity, no GED degree, limited use and understanding of the English language, and her age of 63, this Staff Hearing Officer finds that there are no jobs available for the injured worker.
 The evidence establishes by more than a preponderance that the injured worker is permanently and totally disabled from any and all gainful employment as a result of the allowed conditions in claim number 97-385524. Therefore, it is the order of this Staff Hearing Officer to GRANT the IC-2 Application filed on January 20, 2004.
 It is further ordered that the above award be allocated as follows: 100% of the award is to be paid under Claim Number 97-385524, based upon the reports of Dr. Brue, Dr. Sokoloski, and Dr. Popovich.
(Emphasis sic.)
 {¶ 45} 19. By letter dated October 12, 2004, DaimlerChrysler moved for reconsideration of the September 16, 2004 SHO's order granting a PTD award. Alternatively, DaimlerChrysler moved for a readjustment of the start date for the PTD award. *Page 27 
 {¶ 46} 20. Thereafter, the commission issued an interlocutory order dated November 22, 2004, stating:
 It Is the finding of the Industrial Commission that the employer has presented evidence of sufficient probative value to warrant adjudication of the request for reconsideration regarding the alleged presence of a clear mistake of fact in the order from which reconsideration is sought and a clear mistake of law of such character that remedial action would clearly follow.
 Specifically, it is alleged that the Staff Hearing Officer's start date for payment of permanent total disability payments from the last date of temporary total disability compensation paid, is not supported by any medical.
 Based on these findings, the Industrial Commission directs that the employer's request for reconsideration filed 10/12/2004 is to be set for hearing to determine if the alleged mistake of fact and law as noted herein are sufficient for the Industrial Commission to invoke its continuing jurisdiction.
 In the interests of administrative economy and for the convenience of the parties, after the hearing on the question of continuing jurisdiction, the Industrial Commission will take the matter under advisement and proceed to hear the merits of the underlying issue. The Industrial Commission will thereafter issue an order on the matter of continuing jurisdiction under Ohio Revised Code 4123.52. If authority to invoke continuing jurisdiction is found, the Industrial Commission will address the merits of the underlying issue.
 This order is issued pursuant to State ex rel. Nicholls v. Indus. Comm. (1998) 81 Ohio St.3d 454, State ex rel. Foster v. Indus. Comm. (1999) 85 Ohio St.3d 320, and in accordance with Ohio Administrative Code 4121-3-09.
 {¶ 47} 21. Following a March 8, 2005 hearing before the commission, the commission issued an order stating:
 * * * [I]t is the decision of the Industrial Commission that the employer's request for reconsideration, filed 10/12/2004, is denied. The employer's request for readjustment of the permanent total disability compensation start date and *Page 28 
 reallocation of the permanent total disability compensation is to be referred to the Hearing Administrator pursuant to Hearing Officer Manual Policy G3.
 It is the finding of the Industrial Commission that it does not have authority to invoke continuing jurisdiction pursuant to R.C. 4123.52
and the case law of State ex rel. Nicholls v. Indus. Comm. (1998), 81 Ohio St.3d 454; State ex rel. Foster v. Indus. Comm. (1999), 85 Ohio St.3d 320; and State ex rel. Gobich v. Indus. Comm. (2004), 103 Ohio St.3d 585. It is further the finding of the Industrial Commission that the employer has failed to meet its burden of proving that the Staff Hearing Officer order, dated 09/16/2004, contains a clear error of such character that remedial action would clearly follow. Therefore, the employer's request for reconsideration, filed 10/12/2004, is denied and the order of the Staff Hearing Officer, dated 09/16/2004, remains in full force and effect.
 The Commission orders this claim be referred to the Hearing Administrator to process the employer's request to readjust the permanent total disability compensation start date and to reallocate the permanent total disability compensation award pursuant to G3 of the Hearing Officer Manual Policy.
 {¶ 48} 22. Following a July 6, 2005 hearing, an SHO issued an order stating:
 It is the order of the Staff Hearing Officer that the Employer's Request, filed 10/12/2004, is GRANTED to the extent of this order.
* * *
 The Staff Hearing Officer finds that the onset date of last payment of temporary total compensation is inaccurate. The permanent and total disability finding is based upon the reports of Dr. Popovich, Dr. Sokolowski [sic] and Dr. Brue. This is also a Vocational PTD finding in conjunction with the medical. As a result, the earliest report indicating permanent and total disability is the report of Dr. Sokolowski [sic], dated 3/31/04.
 The Staff Hearing Officer finds that the case of Baker vs. Industrial Commission 97 Oh. State 3 267 is applicable to the onset date in this matter. Dr. Sokolowski [sic] did see the injured worker on 12/10/00, but at that time indicated that the *Page 29 
injured worker was not maximally medically improved, and she could not return to her former position of employment. Dr. Sokolowski [sic] then did not see the injured worker again until 3/31/04. It would be inappropriate to back-date the start date of permanent total disability to the termination date of the maximum medical improvement (MMI). First, the MMI was not based upon Dr. Sokolowski's [sic] report. Second, his first report does not address the issue of permanency, and the second report is not generated until 3/31/04.
 Therefore, the Staff Hearing Officer finds that the earliest date for onset is 3/31/04.
* * *
 This order is based upon the report of Dr. Sokolowski [sic], 3/31/04, and the evidence on file indicating that the injured worker was not able to work since January of 1999.
(Emphasis sic.)
 {¶ 49} 23. On July 27, 2005, relator moved for reconsideration of the SHO's order of July 6, 2005.
 {¶ 50} 24. On August 11, 2005, the commission mailed an order denying relator's request for reconsideration of the SHO's order of July 6, 2005.
 {¶ 51} 25. On September 13, 2005, relator, Nancy Marlow, filed this mandamus action. Thereafter, DaimlerChrysler filed its answer and cross-claim.
Conclusions of Law: {¶ 52} With respect to relator's complaint, three issues are presented: (1) whether the SHO's order of September 16, 2004 awarding PTD compensation contains a clear mistake of law in commencing the PTD award as of the date of the last payment of TTD compensation, rather than upon the evidence relied upon to support the PTD award; (2) assuming that the SHO's order of September 16, 2004 contains a clear mistake of law in commencing the PTD award, did the commission appropriately *Page 30 
exercise its continuing jurisdiction when it ordered the SHO to adjust the start date; and (3) assuming that the commission appropriately exercised its continuing jurisdiction, is the SHO's order of July 6, 2005, adjusting the start date to coincide with the date of Dr. Sokoloski's March 31, 2004 report supported by some evidence upon which the SHO relied?
 {¶ 53} With respect to relator's complaint, the magistrate finds: (1) the SHO's order of September 16, 2004 contains a clear mistake of law in commencing the PTD award as of the date of the last payment of TTD compensation rather than upon the evidence relied upon to support the PTD award; (2) the commission appropriately exercised its continuing jurisdiction when it ordered the SHO to proceed to adjust the PTD start date; and (3) the SHO's order of July 6, 2005 adjusting the start date to coincide with the date of Dr. Sokoloski's report is supported by some evidence.
 {¶ 54} Accordingly, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 55} With respect to DaimlerChrysler's cross-claim, five issues are presented: (1) whether the commission abused its discretion by allegedly relying upon nonallowed conditions; (2) whether the commission abused its discretion in determining that relator's retirement was not a voluntary abandonment of her employment when DaimlerChrysler contends that it never claimed a voluntary abandonment; (3) whether the commission abused its discretion by relying upon Dr. MacGuffie's report when Dr. MacGuffie was declared to not be a vocational expert in an unrelated industrial claim of another claimant; (4) whether the commission abused its discretion when it relied upon the Loomis vocational report; and (5) whether the commission abused its discretion in *Page 31 
determining that relator has not been a viable candidate for vocational rehabilitation since she last worked on January 4, 1999.
 {¶ 56} The magistrate finds: (1) the commission did not abuse its discretion by allegedly relying upon nonallowed conditions; (2) the commission did not abuse its discretion in adjudicating a voluntary abandonment issue; (3) the commission did not abuse its discretion by relying upon Dr. MacGuffie's report; (4) the commission did not abuse its discretion when it relied upon the Loomis report; and (5) the commission did not abuse its discretion when it determined that relator has not been a viable candidate for vocational rehabilitation since she last worked on January 4, 1999.
 {¶ 57} Accordingly, it is the magistrate's decision that this court deny DaimlerChrysler's request for a writ of mandamus, as more fully explained below.
 {¶ 58} Turning to the first issue with respect to relator's complaint, it is fundamental that the start date of a PTD award must be supported by some evidence upon which the commission relied to support its PTD award. State ex rel. Dingus v. Quinn Dev. Co. (1994), 70 Ohio St.3d 580
(the commission's starting date properly coincided with the date of Dr. Ward's report upon which the commission relied to award PTD); State exrel. Baker v. Indus. Comm., 97 Ohio St.3d 267, 2002-Ohio-6341 (Dr. Altic's July 28, 1999 report constitutes some evidence supporting the PTD start date of July 28, 1999, even though Dr. Altic selected a September 27, 1994 start date coinciding with the termination date of TTD compensation); State ex rel. S. Rosenthal Co., Inc. v. Indus.Comm., Franklin App. No. 03AP-113, 2004-Ohio-549 (the May 18, 2000 report of Dr. Stockel constitutes some evidence to support a PTD start date of May 18, 2000); State ex rel. Wheeling-Pittsburgh Steel Corp. v.Indus. Comm., Franklin *Page 32 
App. No. 05AP-913, 2006-Ohio-3912 (because this court eliminated Dr. Timms' report from further evidentiary consideration, the report cannot serve as a basis for setting a start date for PTD compensation).
 {¶ 59} In the SHO's order of September 16, 2004, the SHO awards PTD compensation "from last date of Temporary Total Disability Compensation paid." (Emphasis sic.) Yet, none of the relied upon medical reports, i.e., the reports of Drs. Popovich, Sokoloski, and Brue, coincide with the termination date of TTD compensation.
 {¶ 60} Under such circumstances, the commencement of PTD compensation as of the last date of payment of TTD compensation constitutes a clear mistake of law.
 {¶ 61} Turning to the second issue regarding the commission's exercise of continuing jurisdiction, in response to DaimlerChrysler's October 12, 2004 motion for reconsideration, the commission issued an interlocutory order stating:
 It is the finding of the Industrial Commission that the employer has presented evidence of sufficient probative value to warrant adjudication of the request for reconsideration regarding the alleged presence of a clear mistake of fact in the order from which reconsideration is sought and a clear mistake of law of such character that remedial action would clearly follow.
 Specifically, it is alleged that the Staff Hearing Officer's start date for payment of permanent total disability payments from the last date of temporary total disability compensation paid, is not supported by any medical.
 Based on these findings, the Industrial Commission directs that the employer's request for reconsideration filed 10/12/2004 is to be set for hearing to determine if the alleged mistake of fact and law as noted herein are sufficient for the Industrial Commission to invoke its continuing jurisdiction. *Page 33 
 {¶ 62} Pursuant to the interlocutory order, on March 8, 2005, the commission heard DaimlerChrysler's October 12, 2004 motion for reconsideration. As previously noted, DaimlerChrysler had moved for reconsideration of the PTD award and, alternatively, for readjustment of the start date of the PTD award.
 {¶ 63} In its March 8, 2005 order, the commission found that it did not have continuing jurisdiction to reconsider the PTD award. However, the commission granted DaimlerChrysler's alternative request by referring the matter of start date readjustment to the hearing administrator pursuant to "Hearing Officer Manual Policy G3."
 {¶ 64} Effective May 7, 2001, the commission published a "Hearing Officer Manual" which contains policy statements and guidelines. Pertinent here is "Memo G3" which states:
 If a request for readjustment of a starting date * * * of a permanent and total disability award from an order issued by Staff Hearing Officers is filed, such request is to be referred to the Hearing Administrator. Every request for adjustment of the permanent and total disability starting date * * * is to be accompanied by an explanation supporting why such relief should be granted and the evidence relied on to support the request.
 Prior to the time the Staff Hearing Officers that issued the order awarding permanent total disability compensation adjudicate the request for readjustment of a starting date * * * of a permanent and total disability award under 4123.52, the Hearing Administrator is to make initial contact of the requesting party's representative as well as the opposing party's representative to determine whether the request for adjustment of starting date * * * of the permanent and total disability award is uncontested or contested.
 If the opposing parties and the Administrator do not contest the request for adjustment of starting date * * * and the Staff Hearing Officers are in agreement with the request, the Staff Hearing Officers that issued the order awarding permanent total disability compensation are to issue a supplemental *Page 34 
 order that conforms with the requirements of the Mitchell case.
 If the Hearing Administrator finds that the request is contested, or the Staff Hearing Officers after review, determine that the requested relief is not appropriate, the request is to be scheduled for hearing before the Staff Hearing Officers. The hearing that is held is to be limited to only the issue that is being placed into controversy, whether it is readjustment of starting date * * * of the permanent and total disability award. The Staff Hearing Officers are not to reconsider the merits of the original determination that the claimant is permanently and totally disabled, but are limited to the issue of adjustment of starting date * * * of permanent and total disability com-pensation.
 {¶ 65} R.C. 4121.31 requires the commission to adopt rules concerning procedures for decision making. State ex rel. Saunders v. Indus.Comm., 101 Ohio St.3d 125, 126, 2004-Ohio-339. R.C. 4121.32 requires the commission to supplement its rules with an operating manual. Id. at 127. Consistent with these directives, the commission developed a hearing officer manual containing Memo G3. See Saunders.
 {¶ 66} The magistrate notes that the commission's order of March 8, 2005 fails to repeat what was declared in the commission's interlocutory order — that DaimlerChrysler had alleged that the PTD start date "is not supported by any medical." The March 8, 2005 order refers the matter of PTD start date adjustment to an SHO, but there is no finding of a clear mistake of law in the March 8, 2005 order.
 {¶ 67} Pursuant to the commission's March 8, 2005 order, the matter of start date readjustment was heard by an SHO on July 6, 2005. As noted above, the SHO's order of July 6, 2005 readjusts the start date to coincide with the March 31, 2004 report of Dr. Sokoloski. The SHO's order describes the prior order's commencement of PTD compensation as of the last payment of TTD compensation as "inaccurate." However, *Page 35 
the SHO's order of July 6, 2005 does not specifically declare that the readjustment of the start date was premised upon a clear mistake of law.
 {¶ 68} Continuing jurisdiction is not unlimited. Its prerequisites are: (1) new and changed circumstances; (2) fraud; (3) clear mistake of fact; (4) clear mistake of law; and (5) error by an inferior tribunal.State ex rel. Gobich v. Indus. Comm., 103 Ohio St.3d 585,2004-Ohio-5990; State ex rel. Royal v. Indus. Comm. (2002),95 Ohio St.3d 97; State ex rel. Foster v. Indus. Comm. (1999),85 Ohio St.3d 320; and State ex rel. Nicholls v. Indus. Comm. (1998),81 Ohio St.3d 454.
 {¶ 69} In Gobich, at ¶ 15, the court states:
 The presence of one of these prerequisites must be clearly articulated in any commission order seeking to exercise reconsideration jurisdiction. Nicholls; State ex rel Foster v. Indus. Comm. (1999), 85 Ohio St.3d 320, 707 N.E.2d 1122. This means that the prerequisite must be both identified and explained. Id. It is not enough to say, for example, that there has been a clear error of law. The order must also state what that error is. Nicholls, 81 Ohio St.3d at 459, 692 N.E.2d 188; Foster at 322, 707 N.E.2d 1122. This ensures that the party opposing reconsideration can prepare a meaningful defense to the assertion that continuing jurisdiction is warranted. Royal, 95 Ohio St.3d at 100, 766 N.E.2d 135. It also permits a reviewing court to determine whether continuing jurisdiction was properly invoked. Id. at 99-100, 766 N.E.2d 135.
 {¶ 70} In Gobich, the court held that the commission had improperly exercised continuing jurisdiction when it vacated an SHO's order awarding PTD compensation by pronouncing that the SHO's order is based upon "clear mistakes of law." In Gobich, the Ohio Bureau of Workers' Compensation ("bureau") had moved for a commission reconsideration of the SHO's order.
 {¶ 71} In Gobich, the court found that the bureau's complaint with the SHO's award of PTD was an evidentiary one: *Page 36 
 * * * [T]he bureau produced evidence that it believed established a capacity for sustained remunerative employment, and the SHO found otherwise. Royal, however, has specifically stated that a legitimate disagreement as to evidentiary interpretation does not mean that one of them was mistaken and does not, at a minimum, establish that an error was clear. Id., 95 Ohio St.3d at 100, 766 N.E.2d 135.
 It is also unclear whether the reason for continuing jurisdiction is a mistake of law or a mistake of fact. While the commission claimed the former, it cited no misapplication of the law. To the contrary, it referred only to an omission of fact. Royal, moreover, has categorized evidentiary disputes as factual. This is significant because Nicholls, Foster, and Royal are uncompromising in their demand that the basis for continuing jurisdiction be clearly articulated. The Commission's current justification is ambiguous.
Id. at ¶ 17-18. (Emphasis sic.)
 {¶ 72} In Royal, following the commission's award of PTD compensation, the employer moved for reconsideration. The commission granted reconsideration "based on the possibility of an error in the previous Industrial Commission order." Following a bifurcated hearing which addressed both the propriety of reconsideration and the merits of the PTD claim, two identically dated orders emerged from those proceedings. The first order affirmed the grant of reconsideration based on the presence of a mistake of law or fact. The order identified the mistakes as: (1) the SHO's misrepresentation of a particular vocational report; and (2) the absence of an analysis of nonmedical disability factors.
 {¶ 73} Holding that the commission improperly invoked its continuing jurisdiction, the Royal court explains:
 Identification of error after reconsideration does allow a reviewing court to adjudicate the propriety of the commission's invocation of continuing jurisdiction. It does little to help the party opposing the motion, since it comes too late *Page 37 
 to allow a meaningful challenge to reconsideration at the administrative level. * * *
Id. at 100. (Emphasis sic.)
 {¶ 74} The Royal court found further fault with the commission's exercise of continuing jurisdiction:
 The reliance on "mistake of fact" is equally untenable. When the initial PTD order and disputed reports are read closely, the perceived error is not so much mistake as a difference in evidentiary interpretation. * * *
Id.
 {¶ 75} Citing Gobich, Royal, Foster and Nicholls, relator claims that the commission lacked authority to exercise its continuing jurisdiction over the PTD start date.
 {¶ 76} Relator focuses her argument on the SHO's order of July 6, 2005 arguing that the SHO "simply makes a change in the start date of PTD that seems to be based more on an interpretation of evidence rather than anything else." (Relator's brief, at 8-9.) Relator also points out that the July 6, 2005 SHO's order fails to identify the prerequisite for justifying the exercise of continuing jurisdiction. (Relator's brief, at 9.)
 {¶ 77} In the magistrate's view, the commission's interlocutory order clearly apprised relator that any start date adjustment could be premised upon a clear mistake of law because the start date was "not supported by any medical." That the March 8, 2005 commission order refers the start date readjustment matter to an SHO without further comment as to the basis for such referral is not fatal. *Page 38 
 {¶ 78} Clearly, relator was on notice prior to the July 6, 2005 hearing as to the issue to be decided by the SHO. Thus, the Gobich,Royal, Foster and Nicholls line of cases have been satisfied by the commission.
 {¶ 79} While the SHO's order of July 6, 2005 declares that commencing PTD compensation as of the last date of TTD compensation is "inaccurate," it is nevertheless clear from a reading of the order that the SHO found a clear mistake of law because the SHO cited toBaker, supra. The Baker case makes it clear that the SHO's order of September 16, 2004 presents a clear mistake of law when it starts PTD compensation from the last payment of TTD compensation rather than basing the start date on the medical evidence relied upon to support the PTD award.
 {¶ 80} Thus, based upon the above analysis, the magistrate finds that the commission appropriately exercised its continuing jurisdiction when it readjusted the PTD start date.
 {¶ 81} The third issue regarding relator's complaint is whether the SHO's order of July 6, 2005 adjusting the PTD start date is supported by some evidence.
 {¶ 82} Relator does not actually claim that Dr. Sokoloski's March 31, 2004 report fails to constitute some evidence that relator was permanently and totally disabled as of March 31, 2004. However, relator does claim that it is illogical for the commission to start PTD compensation on the date that it did "for no other reason than that wasthe date she actually saw one of the doctors who wrote a report on theissue of PTD." (Relator's brief, at 17; emphasis sic.) Relator claims that the commission's finding that PTD began on March 31, 2004, creates the illogical corollary that relator could not have been permanently and totally disabled on the day before March 31, 2004, or at any time *Page 39 
prior to that date. Relator further claims that, in enacting R.C.4123.52, the legislature realized that the claimant is permanently and totally disabled before a doctor makes that call and, thus, the legislature directed the commission to back-date PTD awards as much as two years prior to the filing of the application. (Relator's brief, at 14.)
 {¶ 83} In effect, relator claims, based on R.C. 4123.52 and her own logic, that the commission, through its SHO, abused its discretion in premising its start date adjustment on the March 31, 2004 report of Dr. Sokoloski. Relator's claim lacks merit.
 {¶ 84} R.C. 4123.52 states in part: "The commission shall not make any modification, change, finding, or award which shall award compensation for a back period in excess of two years prior to the date of filing application therefor."
 {¶ 85} Relator's claim simply ignores well-settled law that commission awards must be premised upon evidence. Obviously, the scheduling of doctors' examinations will often determine when needed evidence is available to be used in support of a claim for workers' compensation benefits. Obviously, when the commission commences an award of compensation based upon the evidence upon which it relies, in theory, the claimant could have been disabled prior to the commencement of the award. However, the commission must base its decision on the evidence before it and that is what the commission has done in this case.
 {¶ 86} Accordingly, for the foregoing reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.
 {¶ 87} With respect to DaimlerChrysler's cross-complaint, the first issue is whether the commission abused its discretion by allegedly relying upon nonallowed medical conditions. *Page 40 
 {¶ 88} A claimant must always show the existence of a direct and proximate causal relationship between his or her industrial injury and the claimed disability. State ex rel. Waddle v. Indus. Comm. (1993),67 Ohio St.3d 452. Nonallowed medical conditions cannot be used to advance or defeat a claim for compensation. Id.
 {¶ 89} The mere presence of a nonallowed condition in a claim for compensation does not in itself destroy the compensability of the claim, but the claimant must meet his burden of showing that an allowed condition independently caused the disability. State ex rel. Bradley v.Indus. Comm. (1997), 77 Ohio St.3d 239, 242.
 {¶ 90} Here, DaimlerChrysler claims that the SHO's order of September 16, 2004 indicates that the SHO relied on nonallowed conditions in awarding PTD compensation. In support of its claim, DaimlerChrysler points to the following portion of the SHO's order: "The injured worker's treatment included right shoulder repair on February 1, 1996, and left shoulder repair surgery on October 1, 1996."
 {¶ 91} In further support of its claim, DaimlerChrysler points to two operative reports contained in the stipulated record. The first operative report indicates that relator underwent surgery on February 1, 1996 with a post-operative diagnosis of "[c]hronic impingement right shoulder with right shoulder rotator cuff tear." The surgical procedure performed on February 1, 1996 is described in the operative report as "[r]ight shoulder open partial acromionectomy and rotator cuff repair."
 {¶ 92} The second operative report indicates that relator underwent surgery on October 1, 1996. The procedure performed was "[l]eft shoulder rotator cuff repair and partial open acromionectomy." The post-operative diagnosis was "[l]eft shoulder chronic impingement with left rotator cuff tear." *Page 41 
 {¶ 93} According to DaimlerChrysler, none of relator's claims are allowed for the conditions treated by the surgical procedures performed on February 1 and October 1, 1996.
 {¶ 94} Based upon the above-noted documentation, DaimlerChrysler claims that the SHO's order of September 16, 2004 awarding PTD compensation indicates that nonallowed shoulder conditions were relied upon.
 {¶ 95} Relator responds here to DaimlerChrysler's claim by quoting the second to last paragraph of the SHO's order of September 16, 2004:
 The evidence establishes by more than a preponderance that the injured worker is permanently and totally disabled from any and all gainful employment as a result of the allowed conditions in claim number 97-385524.
 {¶ 96} According to relator, "[t]here is simply nothing in [the] SHO's order to suggest that the award of PTD was based on any condition, allowed or non-allowed, involving the Claimant's shoulders." (Relator's reply brief, at 2.)
 {¶ 97} Relator's response to DaimlerChrysler's claim is not accurate.
 {¶ 98} As previously noted, the SHO's order of September 16, 2004 relies upon the reports of Drs. Sokoloski, Popovich and Brue.
 {¶ 99} Dr. Sokoloski examined both of relator's shoulders on March 31, 2004. He further noted that relator had shoulder surgeries to repair rotator cuff tears. Dr. Sokoloski restricted relator to "limited lifting above her head and reaching." He opined that relator "has 1% impairment at the right shoulder and 1% impairment at the left shoulder."
 {¶ 100} Given the commission's reliance upon Dr. Sokoloski's report, relator cannot accurately respond to DaimlerChrysler's claim regarding nonallowed conditions *Page 42 
by asserting that the PTD award was based exclusively upon claim number 97-385524. Clearly, Dr. Sokoloski's medical restrictions, upon which the commission relied, were based in part upon left and right shoulder impairments which Dr. Sokoloski believed were related to the allowed conditions in claim number OD41427-22. Moreover, Dr. Sokoloski's report strongly suggests that Dr. Sokoloski believed that the shoulder surgeries were related to the allowed conditions in claim number OD41427-22.
 {¶ 101} However, that relator's response to DaimlerChrysler's claim is inaccurate does not compel the conclusion that DaimlerChrysler is correct in its claim that the commission abused its discretion by relying upon allegedly nonallowed shoulder conditions in awarding PTD compensation.
 {¶ 102} To begin, Dr. Sokoloski examined relator at the request of DaimlerChrysler. Thus, it is DaimlerChrysler's own medical report that examines for the shoulders, opines as to shoulder impairment, and lists shoulder restrictions.
 {¶ 103} It is DaimlerChrysler's own medical report that discusses the rotator cuff shoulder repairs that occurred in 1996.
 {¶ 104} Because DaimlerChrysler submitted Dr. Sokoloski's report to the commission for its reliance, DaimlerChrysler is in no position here to claim that it was error for the commission to rely, even in part, upon shoulder impairments. Moreover, DaimlerChrysler is in no position here to claim that the shoulder surgeries relate to nonallowed conditions or that any residual impairment from the shoulder surgeries cannot be relied upon by the commission.
 {¶ 105} The magistrate notes that Dr. Lundeen's report submitted by relator in support of the PTD application lists conditions allegedly allowed in claim number *Page 43 
OD41427-22 that are not listed as allowed conditions in the SHO's order of September 16, 2004. That is, Dr. Lundeen lists "bilateral epicondylitis; right rotator cuff tendinitis; bilateral shoulder tendinitis," conditions which are not listed in the SHO's order of September 16, 2004 for claim number OD41427-22.
 {¶ 106} R.C. 4121.36(B)(4) provides that every decision of an SHO or DHO shall be in writing and contain a "[description of the part of the body and nature of the disability recognized in the claim."
 {¶ 107} Notwithstanding this statutory provision, sometimes written decisions contain errors in the listing of the allowed conditions of the industrial claim. State ex rel. Saunders v. Metal Container Corp.
(1990), 52 Ohio St.3d 85.
 {¶ 108} Here, the parties have not stipulated to the allowed conditions in claim number OD41427-22. Under such circumstances, this magistrate cannot assume that the listing of the allowed conditions in the SHO's order of September 16, 2004 is complete. Moreover, it is not the duty of this court, under these circumstances, to determine whether the SHO's order of September 16, 2004 correctly lists all the allowed conditions of claim number OD41427-22 or mistakenly fails to list some of the allowed conditions of that claim.
 {¶ 109} Ohio Adm. Code 4121-3-34(C)(7) provides that following the filing of a PTD application, the employer or the injured worker may request a prehearing conference to be scheduled by the hearing administrator. Ohio Adm. Code 4121-3-34(C)(8) provides that one of the purposes of a prehearing conference can be to reach agreement as to the allowed conditions of a claim. *Page 44 
 {¶ 110} The record before this court discloses that on June 7, 2004, the Toledo Hearing Administrator mailed a letter to the parties indicating that a prehearing conference could be requested. There is no indication in the record that DaimlerChrysler requested a prehearing conference to obtain agreement as to the allowed conditions of any claim. There is no indication in the record that a prehearing conference was ever scheduled.
 {¶ 111} Again, under the circumstances, DaimlerChrysler is in no position here to claim that the commission abused its discretion by allegedly relying upon nonallowed conditions.
 {¶ 112} The second issue with respect to DaimlerChrysler's cross-claim is whether the commission abused its discretion in determining that relator's retirement was not a voluntary abandonment of her employment when DaimlerChrysler contends that it never claimed a voluntary abandonment of employment.
 {¶ 113} According to DaimlerChrysler, that the SHO adjudicated a voluntary abandonment claim when DaimlerChrysler allegedly made no such claim "merely reflects one of the many legal and factual errors contained in his orders." (DaimlerChrysler's brief, at 21.)
 {¶ 114} The September 16, 2004 hearing before the SHO was apparently not recorded so there is no hearing transcript to review. The magistrate does note that DaimlerChrysler raised this issue in its October 12, 2004 letter requesting reconsideration. In the letter, DaimlerChrysler also stated that the SHO's adjudication of the issue "merely reflects one of the many legal and factual errors contained in his orders." *Page 45 
 {¶ 115} In her reply briefs, relator does not respond to DaimlerChrysler's assertion that it never claimed a voluntary abandonment of employment at the September 16, 2004 hearing. (Reply briefs filed January 19 and June 26, 2006.)
 {¶ 116} Because the September 16, 2004 hearing was not recorded, we do not have a transcript of the hearing. Thus, this magistrate has no way of knowing what might have been said to prompt the SHO to address a voluntary abandonment issue.
 {¶ 117} In any event, DaimlerChrysler presents no argument as to how it may have been prejudiced by the SHO's addressing of voluntary abandonment. Accordingly, even if DaimlerChrysler never claimed a voluntary abandonment of employment, and even if the commission was not required to address the issue, DaimlerChrysler fails to show any cause for this court to disturb the order.
 {¶ 118} The third issue with respect to DaimlerChrysler's cross-complaint is whether the commission abused its discretion by relying upon the report of Dr. MacGuffie when he allegedly is not a vocational expert.
 {¶ 119} In its October 12, 2004 letter requesting reconsideration, DaimlerChrysler states:
 On page 3 of his orders, the staff hearing officer reviews and relies on the June 23, 2004 vocational evaluation of Dr. Robert MacGuffie. First, Dr. MacGuffie's vocational evaluation report was never served on counsel for DaimlerChrysler. Rather, counsel for DaimlerChrysler first learned of the report's existence when it was mentioned at the hearing by claimant's counsel. Second, the members of the Industrial Commission have previously found that while Dr. MacGuffie is a psychologist, he is not a vocational expert. (See Findings of Fact and Order of the Commission dated August 29, 1994 and mailed September 27, 1994 attached hereto.) Accordingly, the staff hearing officer erred in relying on Dr. MacGuffie's vocational evaluation report. *Page 46 
 {¶ 120} DaimlerChrysler's attaches to its October 12, 2004 letter, a copy of a commission order issued on September 27, 1994 in the industrial claim of Adam Orosco. In that order, the commission finds that Adam Orosco was not permanently and totally disabled. The order states as follows:
 It is further the finding of the Industrial Commission that Dr. Praul and Dr. MacGuffie are not vocational experts but psychologists. The Commission considered but did not rely upon their reports.
 {¶ 121} It is clear that the commission's declaration in the industrial claim of another injured worker has no binding effect upon the instant industrial claims of relator. Accordingly, the commission had no cause to grant reconsideration based upon the commission's declaration in the unrelated industrial claim. Therefore, the SHO's order of September 16, 2004 cannot be defective for its reliance upon Dr. MacGuffie's vocational report.
 {¶ 122} The fourth issue is whether the commission abused its discretion when it relied upon the vocational report of Loomis.
 {¶ 123} DaimlerChrysler points out that Loomis set forth employment options relating to the reports of Drs. Popovich and Sokoloski and, thus, Loomis found that relator is vocationally able to obtain employment based upon those medical reports. DaimlerChrysler complains here that the SHO's order of September 16, 2004 omits Loomis' ultimate vocational conclusions which are different than the vocational conclusions drawn by the SHO in granting PTD compensation. DaimlerChrysler cites to no authority to support its suggestion that this constitutes an abuse of discretion. (DaimlerChrysler's brief, at 21-22.) *Page 47 
 {¶ 124} The commission may credit vocational evidence but expert opinion is not critical or even necessary, because the commission is the expert on the nonmedical issue. State ex rel. Jackson v. Indus.Comm. (1997), 79 Ohio St.3d 266, 271. Moreover, the commission is free to reject the conclusion of a rehabilitation report and draw its own conclusion from the nonmedical information. State ex rel. Ewart v.Indus. Comm. (1996), 76 Ohio St.3d 139, 141. It is within the commission's discretion to accept a vocational report's underlying facts while rejecting its conclusion. State ex rel. Mann v. Indus. Comm.
(1998), 80 Ohio St.3d 656, 658.
 {¶ 125} Based upon the above authorities, it is clear that DaimlerChrysler has failed to show any abuse of discretion with respect to the commission's reliance upon the Loomis report.
 {¶ 126} The fifth issue with respect to DaimlerChrysler's cross-complaint is whether the commission abused its discretion in determining that relator has not been a viable candidate for vocational rehabilitation since she last worked on January 4, 1999.
 {¶ 127} In presenting this issue, DaimlerChrysler accuses the commission of failing to view PTD compensation as "compensation of last resort," citing from State ex rel. Wilson v. Indus. Comm. (1997),80 Ohio St.3d 250, 253. (DaimlerChrysler's brief, at 23.) DaimlerChrysler simply points out that relator has not participated in any return-to-work initiative since she last worked.
 {¶ 128} DaimlerChrysler is simply expressing its disagreement with the commission's analysis and inviting this court to reweigh the nonmedical evidence for the commission. Accordingly, DaimlerChrysler's presentation of this issue lacks merit. *Page 48 
 {¶ 129} Based upon the foregoing analysis, it is the magistrate's decision that this court deny DaimlerChrysler's request for a writ of mandamus.
 {¶ 130} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny the requests for writs of mandamus.
[1] In a cross-claim, respondent, DaimlerChrysler Corporation ("DaimlerChrysler"), requested a writ of mandamus ordering the commission to vacate its PTD award and its order denying DaimlerChrysler's motion for reconsideration and returning this cause to the commission for further proceedings. On January 17, 2007, this court approved DaimlerChrysler's notice of dismissal of its cross-claim without prejudice.
[2] DaimlerChrysler also filed objections to the magistrate's decision, but its objections relate solely to the magistrate's determination of DaimlerChrysler's cross-claim. Because DaimlerChrysler dismissed its cross-claim, its objections are moot. *Page 1